UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DOSKOCIL MANUFACTURING § 
COMPANY, INC. d/b/a PETMATE, §
 §
 Plaintiff, §
 §
v. § CIVIL ACTION NO.: 3:21-CV-1098-B
 §
MAKE IDEAS, LLC and KEITH §
MULLIN, §
 §
 Defendants. §

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Doskocil Manufacturing Company, Inc. d/b/a Petmate

("Petmate")'s Motion for Partial Summary Judgment (Doc. 50) and Brief in Support (Doc. 51).

For the following reasons, the Motion is **GRANTED in part** and **DENIED in part**.

## I.

## BACKGROUND

Past Fido's backyard fence, this case is about the metes and bounds of intellectual

property in dog toys. Plaintiff Petmate designs, manufactures, and sells pet products, including

product lines such as ChuckIt! toys for fetch. *See* Doc. 52-2, Ex. B, 2. Defendant Keith Mullin is

an inventor, and the founder and president of Defendant Make Ideas, LLC. Mullin is the sole

member of Make Ideas.[1] *See* Doc. 81, Am. Compl., ¶¶ 2–3; Doc. 84, Answer, ¶¶ 3–4.

---

[1]     Where appropriate, the Court will refer to the two Defendants singularly as "Make Ideas." This is
strictly for purposes of readability and carries no legal significance.

The origin of the parties' relationship—and eventual dispute—is Make Ideas' "Breathe Right Ball," which Mullin devised in 2008. *See* Doc. 64-2, Ex. 2. The Breathe Right Ball was designed with the idea that holes in the ball's exterior would provide better airflow to a dog carrying the ball in its mouth during fetch. Doc. 61, Resp., 1; *see also* Doc. 64-2, Ex. 2. Mullin continued to work on prototypes and other versions of the product in the years following, including a ball launcher, football, and disk. *See* Doc. 64-10, Ex. 10. Mullin disclosed his ideas to Petmate under a non-disclosure agreement in July 2014. Doc. 61, Resp., 2; Doc. 64-10, Ex. 10.

Petmate, for its part, had been developing pet products with holes—including balls and footballs—for years. For example, Petmate had two design patents for its "JW Holee Roller" balls that were filed in 2001 and 2002. Doc. 52-3, Ex. C, 1; Doc. 52-4, Ex. D, 1. Nevertheless, Petmate saw value in Make Ideas' intellectual property, and the parties entered into an Intellectual Property License and Product Agreement ("License Agreement") in January 2016. *See generally* Doc. 52-1, Ex. A. The License Agreement had a five-year term, during which Make Ideas granted Petmate "an exclusive license to use the Make Ideas Intellectual Property" in connection with the licensed products. Doc. 52-1, Ex. A, §§ 2.1, 9.1. In exchange for the license, Petmate agreed to pay royalties to Make Ideas on the licensed products' sales. *Id.* § 6.1.

As the License Agreement's term drew near, the parties attempted to negotiate an extension but ultimately could not resolve their differences. Doc. 61, Resp., 4. After a series of temporary extensions, Make Ideas terminated the License Agreement. *Id.* Petmate filed the present action in May 2021, seeking various forms of declaratory relief and damages for breach of contract. *See generally* Doc. 1, Compl. In response, Make Ideas and Mullin filed counterclaims against Petmate seeking relief on similar issues. *See generally* Doc. 20, Answer.

Petmate now seeks summary judgment as to seven claims or issues regarding (1) trademark ownership under the License Agreement, (2) joint inventorship of design patents, (3) ownership of design patents under the License Agreement, (4) ownership of utility patents under the License Agreement, (5) copyright infringement, (6) breach of contract, and (7) patent infringement damages. *See generally* Doc. 51, Br. Supp. Summ. J.

## II.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, "[i]f the burden at trial rests on the non-movant, the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case." *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

"[T]he substantive law . . . identif[ies] which facts are material," and only a "dispute[] over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the facts and the inferences drawn from the facts "in the light most favorable to the [non-movant]." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the summary-judgment movant has met its burden, "the non[-]movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citation omitted). A non-movant may not simply rely on the Court to "sift through the record" to find a fact issue but

must point to specific evidence in the record and articulate precisely how that evidence supports the challenged claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Moreover, the evidence the non-movant provides must raise "more than . . . some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The evidence must be such that a jury could reasonably find in the non-movant's favor. *Anderson*, 477 U.S. at 248. If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1075.

## III.

## ANALYSIS

The Court addresses each of Petmate's seven summary judgment issues in turn.

A.   *Ownership of Trademarks Under the License Agreement*

Both parties seek declaratory judgment as to the proper ownership of six trademarks or pending trademark applications filed during the term of the License Agreement. Doc. 81, Am. Compl.,[2] ¶¶ 25–28; Doc. 84, Am. Answer, 22. Specifically, the trademarks at issue are

1. U.S. Trademark Reg. No. 5,351,758 for "Run Farther, Fetch Longer";
2. U.S. Trademark App. Serial No. 90521385 for "Fetch Hard, Breathe Easy";
3. U.S. Trademark App. Serial No. 90521344 for "Chuckit! Air";
4. U.S. Trademark App. Serial No. 90327551 for "Breathe It";
5. U.S. Trademark App. Serial No. 90327546 for "Breathe Easy"; and
6. U.S. Trademark App. Serial No. 90327534 for "Chuckit! Breathe".

---

[2]       Since filing its Partial Motion for Summary Judgment (Doc. 50), Petmate has filed an Amended Complaint (Doc. 81), and Make Ideas and Mullin have jointly filed an Amended Answer (Doc. 84). The Amended Complaint and Amended Answer, however, do not affect the claims at issue in Petmate's Partial Motion for Summary Judgment. Accordingly, the Partial Motion for Summary Judgment is not moot, and the Court's ruling on the Motion fully applies to the live pleadings on file (Doc. 81 & Doc. 84).

Doc. 51, Br. Supp., 6. Ownership of the trademarks ultimately comes down to competing

interpretations of two provisions of the License Agreement dictating the ownership of trademark

rights. The License Agreement provides:

PATENTS

> 3.1    Except for USPTO Provisional Patent, Application Number #62,280,810
> and the future nonprovisional patent application claiming priority to Application
> Number #62,280,810 (the Nonprovisional Application), Petmate will own all
> existing patents during the Term and will be free to pursue patent protection for
> any improvements in its sole discretion. Make Ideas will timely file the
> Nonprovisional Application and keep Petmate informed about the status of the
> Nonprovisional Application. Licensee shall pay for any additional U.S. and
> international patent applications or trademark applications if determined by
> Licensee and approved by Licensor. Licensor shall assist in non-provisional
> patents or trademark production, as well as review and approve patent
> application(s), at Licensee's cost. All patents, trademarks and applications
> therefor shall be owned exclusively in the name of Licensor.
>
> . . .

TRADEMARKS

> 4.1    Make Ideas grants to Petmate during the Term an exclusive license to use
> the marks included in the Make Ideas Intellectual Property, including (without
> limitation) the names BREATHE RIGHT BALL or any variations thereof, for the
> Products alone or with other names, and any associated logos, e.g., on packaging,
> sell sheets, etc. Petmate is under no obligation to use the mark BREATHE
> RIGHT BALL and may brand the Products in its sole discretion. Petmate shall
> own any brands it may select to identify the Licensed Products other than marks
> with the words BREATHE and RIGHT.

Doc. 52-1, Ex. A, §§ 3.1, 4.1. Petmate contends that, under Section 4.1, it owns any brands it

selects to identify the products sold under the License Agreement other than those with the

words "Breathe" *and* "Right." Doc. 51, Br. Supp., 7. Thus, because none of the trademarks at

issue contain both those words, Petmate owns the marks. *Id.*   Petmate attaches no legal

significance to Section 4.1's varying use of the words "brand" and "mark." *See* Doc. 65, Reply, 2.

Rather, Petmate urges that the terms "brand" and "mark" are essentially synonymous and, even if

5

they are not, a "brand" is broader than a "mark" and would necessarily include the trademarks at issue anyway. *Id.* at 2–3.

Make Ideas offers a different interpretation. Make Ideas argues a "brand" is different than a "mark" and only refers to broad product categories such as "Chuckit!" Doc. 61, Resp., 7–8. Thus, the License Agreement only grants Petmate ownership rights to brands that may be selected to identify the Licensed Products but not individual marks. *Id.* at 8. Make Ideas further claims that Section 4.1 gives it ownership over trademarks which include "Breathe Right Ball," "Breathe Right," and variations thereof, thus encompassing the trademarks at issue. *Id.* Finally, Make Ideas points to the last sentence of Section 3.1, which provides that "[a]ll patents, trademarks and applications therefor shall be owned exclusively in the name of Licensor [Make Ideas]." *Id.*

Despite its declaratory judgment posture, this is ultimately a question of contract, and this Court therefore applies Texas choice-of-law rules. *See Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010); *Harris Cnty. Tex. v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015) ("[T]he Declaratory Judgment Act alone does not create a federal cause of action."). In Texas, contractual choice-of-law provisions are typically enforced unless the provision "violates a fundamental public policy of Texas." *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004). The License Agreement at issue contains a Texas choice-of-law provision, Doc. 52-1, Ex. A, § 12.2, and the Court is not aware of any public-policy concerns. Accordingly, this Court will apply Texas law in interpreting the contract.

"In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004).

Whether an ambiguity exists in the language of a contract is a question of law for the court to determine. *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). If the contract can be given "a definite or certain legal meaning," then it is unambiguous and may be enforced as written. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). The Court will not find a contract ambiguous merely because the parties advance conflicting interpretations. *Kelley-Coppedge, Inc.*, 980 S.W.2d at 465.

"In construing the terms of a contract, the court's primary purpose is always to ascertain the true intent of the parties as expressed in the written instrument." *Gregg & Valby, L.L.P. v. Great Am. Ins. Co.*, 316 F. Supp. 2d 505, 508 (S.D. Tex. 2004); *accord Nat'l Union Fire*, 907 S.W.2d at 520. The Court must therefore "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis omitted). "The terms used in the contract are given their plain, ordinary meaning unless the contract itself shows that the parties intended the terms to have a different, technical meaning." *Gonzalez*, 394 F.3d at 392 (alterations omitted) (applying Texas law). Similarly, "specific and exact terms are given greater weight than general language." *Sefzik v. Mady Dev., L.P.*, 231 S.W.3d 456, 461 (Tex. App.—Dallas 2007, no pet.) (alterations omitted).

The Court finds the contract unambiguously reserves trademark ownership rights for Petmate, except as to a narrow range of marks originating from the mark "Breathe Right Ball" that contain the words "Breathe" and "Right." The Court begins with Section 4.1 of the License Agreement, which directly addresses trademarks. Doc. 52-1, Ex. A, § 4.1. The first sentence of that provision indicates that Make Ideas has granted Petmate an exclusive license for the marks

"included in the Make Ideas Intellectual Property, including (without limitation) the names BREATHE RIGHT BALL or any variations thereof." *Id.*

The next two sentences of the provision further delineate Make Ideas' scope of ownership, largely by defining the rights Petmate retains. Specifically, "Petmate is under no obligation to use the mark BREATHE RIGHT BALL and may brand the Products in its sole discretion." *Id.* And "Petmate shall own any brands it may select to identify the Licensed Products other than marks with the words BREATHE *and* RIGHT." *Id.* (emphasis added). Together, the License Agreement gives Petmate discretion to use its marks, which it will own, unless Petmate decides to use Make Ideas' BREATHE RIGHT BALL mark or variations thereof. *See id.* The last provision adds clarity as to what may constitute a "variation thereof," indicating that, at the least, it must contain the words "Breathe" and "Right." *Id.*

Similarly, despite Make Ideas' argument, the Court finds that "brand" and "mark" are functionally equivalent in this instance. Looking at the entirety of Section 4.1, the term "brand" is used interchangeably with "mark." *E.g., id.* ("Petmate is under no obligation to use the mark BREATHE RIGHT BALL and may brand the Products in its sole discretion.") Additionally, "brand" is seemingly used in the License Agreement as a source identifier, which is doctrinally consistent with the purpose of trademark. *See id.* ("Petmate shall own any brands it may select to identify the Licensed Products . . . ."); 15 U.S.C. § 1127 ("The term 'trademark' includes any word . . . (1) used by a person, . . . to identify and distinguish his or her goods . . . and to indicate the source of the goods, even if that source is unknown.").

The Court is likewise unconvinced that Section 3.1 changes this result. Although Section 3.1 contains a sentence providing that "[a]ll patents, trademarks and applications therefor shall be owned exclusively in the name of Licensor [Make Ideas]," this provision is considerably

limited by its context. *See* Doc. 52-1, Ex. A, § 3.1. Most obviously, the sentence cannot be a blanket pronouncement of Make Ideas' ownership, or else the entire preceding provision on patent ownership and subsequent provision on trademark ownership would be unnecessary and superfluous. *See Coker*, 650 S.W.2d at 393 ("[C]ourts should examine and consider the entire writing . . . so that none will be rendered meaningless.") (emphasis omitted). Rather, the sentence is located within the contractual provision governing patents and is qualified by the word "therefor." *See* Doc. 52-1, Ex. A, § 3.1. Indeed, the sentence refers back to "additional . . . patent applications or trademark applications" pertaining to Make Ideas' provisional patent and "future nonprovisional patent" for the Breathe Right Ball. *See id.* For trademarks, the general scope of that ownership is then more specifically defined in the "Trademarks" provision, to which the Court affords more weight. *Id.* § 4.1; *see also Sefzik*, 231 S.W.3d at 461.

Therefore, the Court finds that the License Agreement unambiguously gives Petmate ownership rights over trademarks it uses to identify the Licensed Products unless a mark stems from the "Breathe Right Ball" mark and contains the words "Breathe" and "Right." *See* Doc. 52-1, Ex. A, § 4.1. Because the Court finds the contract is not susceptible to multiple reasonable interpretations, the terms can be enforced as written. *See Nat'l Union Fire*, 907 S.W.2d at 520. And although some of the trademarks at issue contain the word "Breathe," none contain both "Breathe" and "Right," as necessary under the License Agreement. Accordingly, the Court grants Petmate's Motion for Summary Judgment as to the ownership of the six disputed trademarks or trademark applications.

B.      *Joint Inventorship*

Petmate also moves for summary judgment as to Mullin's correction of inventorship claim (and Petmate's inverse declaratory judgment claim) for three design patents: U.S. Patent No.

D869,105 ("the Stick"); U.S. Patent No. D870,986 ("the Football"); and U.S. Patent No. D930,289 ("the Wheel"). *See* Doc. 81, Am. Compl., ¶¶ 37–40; Doc. 84, Am. Answer, ¶¶ 34–41. In particular, Mullin alleges he contributed to the conception of these three design patents and should therefore be named as a joint inventor. Doc. 84, Am. Answer, ¶¶ 34–41. The Court begins by laying out the standard for joint inventorship, as qualified by the scope of the design patents at issue. The Court then analyzes Mullin's alleged contributions for each of the design patents to determine whether a reasonable juror could deem Mullin a joint inventor.

"A person who alleges that he is a co-inventor of the invention claimed in an issued patent who was not listed as an inventor on the patent may bring a cause of action to correct inventorship in a district court under 35 U.S.C. § 256." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1357 n.1 (Fed. Cir. 2004). But the inventors named on "an issued patent are presumed to be correct," and "a party alleging misjoinder or non-joinder of inventors must meet the heavy burden of proving its case by clear and convincing evidence." *Id.* at 1358.

Though § 256 provides the cause of action, 35 U.S.C. § 116 provides the framework for joint inventorship. Section 116 indicates that a person claiming joint inventorship "need not demonstrate that he made a contribution equal in importance to the contribution made by the listed inventors" and, in fact, "sets no explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor." *Id.* (first citing 35 U.S.C. § 116; then citing *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997)). Rather, the touchpoint for joint inventorship is whether the person contributed to the conception of the claimed invention. *E.g., Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1303 (Fed. Cir. 2010). And while identifying a contribution to conception may be difficult in certain circumstances, several cases provide analytical bumpers relevant here.

First, "[c]ontributions to realizing an invention may not amount to a contribution to conception if they merely explain what was 'then state of the art.'" *Eli Lilly*, 376 F.3d at 1359 (quoting *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 981 (Fed. Cir. 1997)). Second, "[o]ne who merely suggests an idea of a result to be accomplished, rather than means of accomplishing it, is not a joint inventor." *Garrett Corp. v. United States*, 422 F.2d 874, 881 (Ct. Cl. 1970); *accord Eli Lilly*, 376 F.3d at 1359. And finally, "the alleged joint inventor seeking to be listed on a patent must demonstrate that his labors were conjoined with the efforts of the named inventors." *Eli Lilly*, 376 F.3d at 1359.

Determining joint inventorship also requires understanding the scope of the design patents at issue. Design patents are very narrow; they only protect the novel, ornamental features of the patented design. *OddzOn Prod., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997). In comparison to utility patents, design patents do not cover any functional elements, and "the scope of the claim must be construed to identify the non-functional aspects of the design as shown in the patent." *See id.* In some cases, determining joint inventorship may require verbally outlining the scope of the claim at issue. *See Safco Prod. Co. v. Welcom Prod., Inc.*, 799 F. Supp. 2d 967, 976 (D. Minn. 2011). But the Federal Circuit has also indicated "the preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008). Rather, because the design patents "typically are claimed as shown in drawings," the drawing itself is usually its own best description. *Id.* (citing Manual of Patent Examining Procedure § 1503.01 (8th ed. 2006)).

Here, the parties have not proposed a written claim construction for the design elements at issue, though implicitly Petmate is focused on the design of the toys' latticework, while Mullin

11

focuses more broadly on features such as the toys' shape and holes. *Compare, e.g.*, Doc. 51, Br. Supp., 10 ("[The Stick] has none of the novel latticework design features of Petmate's design."), *with* Doc. 61, Resp., 19 (describing the Stick's ornamental design elements as, among other things, the "[c]ylindrical stick shape body" and the "[r]ecessed lattice channels arranged perpendicular to the center axis"). The Court agrees with Petmate that the design patents are limited to the ornamental elements, primarily arising from the toys' latticework designs. *See OddzOn Prod.*, 122 F.3d at 1405 ("We agree with the district court's claim construction, which properly limits the scope of the patent to its overall ornamental visual impression, rather than to the broader general design concept of a rocket-like tossing ball."). But the Court ultimately need not demarcate the design patents' outer bounds because Mullin has not shown collaboration in the designs' conception. That is, viewing the facts in the light most favorable to Mullin, the Court finds that no reasonable juror could find by clear and convincing evidence that Mullin collaborated in the conception of the design patents at issue. The Court addresses each design patent in turn.



FIG. 1

1.      The Stick—U.S. Patent No. D869,105

Petmate's design patent for the Stick is best captured in the image itself:

Doc. 52-16, Ex. P, 3. Mullin identifies several instances in which he alleges he contributed to the design of the Stick. Mullin first points to a drawing in his 2017 inventor's notebook depicting a "cylindrical stick with elements that allow the animal to breathe." Doc. 61, Resp., 18–19.



Doc. 64-33, Ex. 33, 1. But Mullin has provided no evidence that he ever showed this initial drawing to Petmate. *See* Doc. 62, Mullin Decl., ¶ 35. And, in any event, Mullin's drawing does not amount to collaborating in the conception of the Stick's design. Given the limited scope of design patents, Mullin's first drawing in his inventor's notebook is merely suggesting "a result to be accomplished, rather than means of accomplishing it." *See Garrett Corp.*, 422 F.2d at 881. That is, Mullin's inventor's notebook at most only proves that Mullin helped create the original idea for a toy stick with breathing holes—functional elements—but did not ultimately collaborate in the conception of the product's overall ornamental impression or design. *See OddzOn Prod.*, 122 F.3d at 1405.

Mullin also points to a stick design he provided in a document to Petmate on potential extensions to the Breathe Right product line.



Doc. 52-22, Ex. V, 4. But again, this contribution does not clearly or convincingly amount to collaborating in the ultimate design's conception. Even more problematically, the toy stick depicted above is prior art that cannot serve as the basis for joint inventorship. *See Eli Lilly*, 376 F.3d at 1359. As Petmate has indicated and Mullin has not contested, the design above is an image from a toy already created and marketed by a third party, Hyper Pets. Doc. 51, Br. Supp., 10. Thus, Mullin merely passed along existing prior art to Petmate, which does not equate to any collaboration in the design's conception.

2.   The Football—U.S. Patent No. D870,986



For similar reasons, no reasonable juror could find by clear and convincing evidence that Mullin collaborated in the conception of Petmate's design patent for the Football. Like the Stick, the scope of the Football design patent only extends to the novel ornamental elements and the product's overall visual impression. The scope of the design patent is best captured in the image itself:

Doc. 52-15, Ex. O, 9. Mullin points to two contributions he made regarding the Football design. First, Mullin claims he "conceived of most of the ornamental design elements," such as the "perforated prolate spheroid" with "perforated cutouts that allow the animal to breathe," which he presented to Petmate in a 2014 meeting:



Doc. 61, Resp., 12; Doc. 64-10, Ex. 10, 7. But like the Stick, the "prolate spheroid shape" or the "perforated cutouts" cannot serve as the basis for the design patent, as they are functional elements. *See OddzOn Prod.*, 122 F.3d at 1405. Viewed in the context of a design patent, Mullin's contribution at most amounts to broadly suggesting a product idea without collaborating as to the means for accomplishing it.

Mullin also highlights a picture of a toy football he presented to Petmate executives as a something he "thought . . . would be a good addition to the Breathe Right line." Doc. 64-24, Ex. 24, 1.



*Id.* at 2. But like the Stick, Mullin's contribution consists of showing Petmate a preexisting third-party product or prior art and suggesting it adopt that idea as an extension of the Breathe Right line. Mullin has not demonstrated whatsoever how he collaborated with the inventors in designing the unique latticework of the Football design patent. This is especially the case given Petmate already had a design patent for a toy football with holes:



FIG. 1

Doc. 52-4, Ex. D, 2 (depicting US D479,897, filed August 29, 2002).

16

3.     The Wheel—U.S. Patent No. D930,289[3]

Finally, the Court addresses Mullin's claimed inventorship in the Wheel design patent.

The Wheel design patent shows a similar latticework design to the other products:



Doc. 52-17, Ex. Q, 3.

---

[3]      Neither Petmate's claims nor Make Ideas' counterclaims mention the US D930,289 Patent ("the D'289 Patent" or "Wheel"). But both parties' briefs on the Motion address the Wheel and make arguments regarding Mullin's joint inventorship. *See* Doc. 51, Br. Supp., 11–12; Doc. 61, Resp., 15. Because the law and analysis are essentially the same, the Court exercises its discretion to consider a claim regarding joint inventorship of the Wheel. *See Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 989 n.2 (5th Cir. 2008) (collecting cases).

In support of his claims of joint inventorship, Mullin points to two contributions. First,



Mullin says he presented a disk product design in a meeting with Petmate in 2014:

Doc. 64-23, Ex. 23, 15.

Mullin then improved the design and provided Petmate with another "invention disclosure document" in 2017 that depicted a mock-up of a "Breathe Right Frisbee." Doc. 64, Resp., 16.



Doc. 64-25, Ex. 25, 5. Based on these contributions, Mullin claims he contributed the basic ornamental elements of the Wheel design patent, including things such as the "circular body shape," "rounded edge arranged around the circumference," and "square latticework through holes." Doc. 61, Resp., 16–17.

Like the Stick and Football, Mullin has not proven any collaboration in conception of the design patent. His supposed ornamental contributions are functional elements of a basic frisbee, or otherwise are not relevant to the design patent's overall ornamental visual impression and design. At best, Mullin's contributions were suggesting a product result for Petmate to ultimately design and produce.

Plus, for any design patent at issue, Mullin has not even demonstrated contact—not to mention collaboration—with the named inventors. *Cf. Eli Lilly*, 376 F.3d at 1359 ("[T]he alleged joint inventor . . . must demonstrate that his labors were conjoined with the efforts of the *named inventors*.") (emphasis added). Rather, Mullin does not believe he has ever met the inventors named in the design patents. *See* Doc. 52-19, Ex. S, 3, 9, 14. His participation, therefore, consists of broadly suggesting product extensions for the Breathe Right line but does not include the type of collaboration in conception necessary for joint inventorship of a design patent.

C.    *Ownership of the Design Patents Under the License Agreement*

Aside from joint inventorship, the parties also debate ownership of several design patents.[4] The design patents' ownership is a contractual question. The Court therefore applies the same summary judgment standard articulated above and will grant summary judgment to Petmate only if the contract is unambiguous and Petmate is entitled to judgment as a matter of law. *See supra* Section A. In interpreting the contract, the Court gives terms their plain, ordinary meaning and attempts to give effect to every provision. *Coker*, 650 S.W.2d at 393; *Gonzalez*, 394 F.3d at 392.

---

[4]    Petmate moves for summary judgment as to the ownership of four design patents, identified in its brief. *See* Doc. 51, Br. Supp., 12. Make Ideas' response only contemplates an ownership disagreement as to three of the design patents and does not include U.S. Patent No. D930,288. *See* Doc. 61, Resp., 21. The issue of ownership, however, is first a question of contractual interpretation. And because the Court denies summary judgment as to this issue, the discrepancy in the briefs is immaterial at this stage.

Supporting its claim of ownership over the design patents, Petmate emphasizes Section 9.6 of the License Agreement, which falls under the "Term and Termination" header and reads in full:

> 9.6      In the event of Termination, Petmate shall assign back to Make Ideas, all Make Ideas Intellectual Property that was assigned to Petmate, other than any Brands that were selected by Petmate or any intellectual property that was independently created by Petmate.

Doc. 52-1, Ex. A, § 9.6. In particular, Petmate argues that if the Court rules in favor of Petmate on the issue of joint inventorship, then the designs are "necessarily independently created by Petmate and without Mullin." Doc. 51, Br. Supp., 13.

Make Ideas responds by highlighting the last sentence in Section 3.1, discussed above, which provides that "[a]ll patents, trademarks and applications therefor shall be owned exclusively in the name of Licensor [Make Ideas]." Doc. 52-1, Ex. A, § 3.1. Make Ideas says Section 3.1 controls the issue of ownership over all patents, including design patents. Doc. 61, Resp., 21. Make Ideas also points the Court to Section 1.1 of the License Agreement, which is under the "Definitions" header and provides in full:

> 1.1      "Make Ideas Intellectual Property" or Make Ideas IP means (i) all patents and patent applications on which Make Ideas or its owners is listed as an inventor, assignee, licensee and/or owner; (ii) the trademark, including any associated logos; (iii) all copyrights in which Make Ideas is an author or joint author; (iv) other product concepts, modifications, improvement, or ideas relating to whether patentable or not. Attached as Schedule C is a current list of Make Ideas IP trademark applications and concepts.

Doc. 52-1, Ex. A, § 1.1. Make Ideas contends Mullin's contributions to the ornamental design elements qualify as "product concepts, modifications, improvements or ideas" and therefore confer ownership rights. Doc. 61, Resp., 21.

Ultimately, neither party's proposed interpretations are convincing. Despite Petmate's argument, nothing in the contract supports the notion that "independent creation" under Section 9.6 is necessarily the converse of joint inventorship. Rather, plenty of activities may qualify as joint creation, as those terms are plainly and ordinarily understood, that nonetheless do not arise to the legal level of "collaboration in conception" required for joint inventorship. *See Eli Lilly*, 376 F.3d at 1359 ("The line between actual contributions to conception and the remaining, more prosaic contributions to the inventive process that do not render the contributor a co-inventor is sometimes a difficult one to draw.").

Indeed, under Sections 1.1 and 3.1, a genuine dispute of material fact exists as to whether Mullin's contributions, though not amounting to joint inventorship, may nonetheless qualify as a "product concept[], modification[], improvement, or idea[]" relating to the patent and patent applications on which Make Ideas is listed as an inventor, assignee, licensee, and/or owner. *See* Doc. 52-1, Ex. A, § 1.1. Or Make Ideas may claim ownership under Section 3.1, which gives Make Ideas ownership to a set of patents "additional" to the provisional and nonprovisional patents recognized in the contract and "determined" by Petmate. *Id.* § 3.1.

Ultimately, the Court need not decide these issues as to Make Ideas' ownership today because Petmate has not carried its burden as to its ownership of the design patents. The contract does not support Petmate's reading of "independent creation," and Petmate is therefore not entitled to summary judgment on that issue.

D.    *Ownership of the Utility Patents Under the License Agreement*

The parties also dispute ownership of two utility patents[5] relating to a method of manufacture. *See* Doc. 81, Am. Compl., ¶¶ 29–32; Doc. 84, Am. Answer, ¶¶ 46–49. The parties' arguments for their respective ownership are familiar.

Petmate argues that because Mullin does not claim joint inventorship of either utility patent, the patents were necessarily "independently created by Petmate" and owned by Petmate pursuant to Section 9.6. Doc. 51, Br. Supp., 14. Petmate also emphasizes that both patents have a priority filing date of March 3, 2015, which predates the terms of the License Agreement, and thus "no interpretation of the License Agreement" could support Make Ideas' ownership of the patents. *Id.*

Make Ideas raises several arguments, including the last sentence of Section 3.1, which it says governs ownership of "all patents." Doc. 61, Resp., 28. It further alleges that prior to the filing of the provisional patents, Mullin had entered a Confidential Disclosure Agreement with Petmate that included "drawings and prototypes of the Breathe Right Ball and other pet toys." *Id.* at 24. Make Ideas also encourages the Court to consider that the nonprovisional, as opposed to the provisional, applications for the patents were filed during the term of the License Agreement. *Id.* And finally, Make Ideas contends that the patents were "used by Petmate to manufacture Licensed Products." *Id.*

As a threshold issue, and as discussed above, the Court disagrees with Petmate that a lack of joint inventorship requires a finding of "independent creation" under Section 9.6. *See supra* Section C. But the relevancy of Make Ideas' arguments regarding the Confidentiality Agreement

---

[5]      The utility patents at issue are U.S. Patent Nos. 9,962,864 ("the '864 Patent") and 10,919,185 ("the '185 Patent").

and Petmate's use of the manufacturing process is also lost on the Court. Like the prior issues, this is ultimately a question of contract.

Applying the same standard articulated above, the Court finds that the contract unambiguously reserves Petmate's ownership rights over patents already existing at the time the parties entered the License Agreement. The Court further finds that "existing patents" includes both provisional and nonprovisional patents. The first clause of Section 3.1 makes this clear, providing "Except for USPTO Provisional Patent, Application Number #62,280,810 and the future nonprovisional patent application claiming priority to Application Number #62,280,810 (the Nonprovisional Application), Petmate will own all existing patents . . . ." Doc. 52-1, Ex. A, § 3.1. Thus, reading "existing patents" to include provisional patents avoids rendering the first portion of that clause superfluous. *See Coker*, 650 S.W.2d at 393. This interpretation is likewise consistent with the text's plain meaning and the patent statute's treatment of provisional and nonprovisional patents for purposes of priority. *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294 (Fed. Cir. 2002) (first citing 35 U.S.C. § 111(b); then citing 35 U.S.C. § 119(e)(1)).

Accordingly, the Court finds that the contract is unambiguous in reserving Petmate's ownership of patents already in existence at the time of the License Agreement, including provisional patents. The Court further finds that there is no genuine dispute of material fact as to whether the two utility patents at issue were in existence at the time of the License Agreement. Both patents have a priority date of March 5, 2013, based on the filing of a provisional application. *See* Doc. 52-13, Ex. M, 1; Doc. 52-14, Ex. N, 1. The License Agreement is dated January 1, 2016, well after the applications were filed. Doc. 52-1, Ex. A, 1. Thus, the Court grants Petmate's Motion for Summary Judgment as to the ownership of the utility patents.

23

E.    *Copyright Infringement*

Petmate also seeks summary judgment as to Make Ideas' copyright infringement counterclaim. Doc. 51, Br. Supp., 14–20. Make Ideas alleges Petmate has infringed Make Ideas' copyright in the "Breathe Right Book, Vol. 2," which is currently registered with the U.S. Copyright Office. Doc. 64-16, Ex. 16, 1. Generously named, the Breathe Right Book, Vol. 2 consists of three pages, including an initial title page. *See generally id.* The first portion contains a bulleted list of "Breathe Right® Benefit Statements and USPs" (presumably short for "unique selling points"). *Id.* at 3–4. These bullets are primarily short slogans or marketing statements promoting the Breathe Right Ball or related products. For example:

- No more gasping for air when carrying a tennis ball. Breathe better when playing fetch to keep your endurance up. It floats too !

- Get more oxygen when running and play fetch longer.

- No more constricted breathing and coughing when swimming.

- No more gasping for air when carrying a ball.

- With Breathe Right, your dog can fetch hard and breathe easy.

*Id.* The second portion of the Breathe Right Book provides the "Breathe Right® Method of Use," which contains a functional summary of Mullin's utility patent for the Breathe Right Ball. *Id.* at 4. For example, the summary describes how "[w]ith increased air flow and breathing, the dog gets more oxygen when running and exercising while holding the ball in its mouth." *Id.*

Make Ideas alleges Petmate has infringed the copyright through, among other things, Petmate's product packaging, marketing materials, and webpages for various products such as "Chuckit! Breathe Right or Chuckit! Air Fetch Ball." Doc. 84, Am. Answer, ¶¶ 23–24. Make Ideas has not, however, made clear what exactly the allegedly infringing materials contained in

terms of content or expression, other than suggesting they were "substantially similar" to the Breathe Right Book. *See id.* ¶¶ 23–25.

To prove copyright infringement, Make Ideas must establish "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Copyright certificates of registration, however, constitute prima facie evidence of the validity of copyrights, and the defendant must then overcome that presumption. 17 U.S.C. § 410(c); *Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1995).

As to the second element of copying, Make Ideas has not provided any evidence of Petmate copying constituent elements of original works. Rather, Make Ideas' theory of infringement rests on blanket allegations in its counterclaims that Petmate's materials are "substantially similar" to its copyright. *See* Doc. 84, Am. Answer, ¶¶ 23–25. Make Ideas has not, to the Court's knowledge, provided any exhibits illustrating the supposedly infringing materials or even identified which portions of the Breathe Right Book were allegedly copied. Thus, even though Make Ideas is the nonmovant here, Petmate may satisfy its burden by showing an absence of evidence to support the non-movant's case. *See Byers*, 209 F.3d at 424; Doc. 51, Br. Supp., 15 ("Mullin cannot articulate what are his copyrights, and what copyrighted elements Petmate has allegedly infringed.").

But even if Make Ideas had provided the allegedly infringing materials, the Court finds that, at least as to the list of phrases, Petmate has carried its burden in rebutting the validity of Make Ideas' copyright. For copyright protection, "a work must be original to the author." *Feist*, 499 U.S. at 345. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it

possesses at least some minimal degree of creativity." *Id.* The standard for originality, therefore, is not high, "but it does exist." *Id.* at 362. As such, a Copyright Office regulation has specified that "words and short phrases such as names, titles, and slogans" are not subject to copyright. 37 C.F.R. § 202.1.[6]

The requirement of originality also means that facts are not copyrightable. *Feist*, 499 U.S. at 347. Nor does copyright protection "extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102. In short, "a copyright bars others from copying an author's original expression of an idea, it does not bar them from using the idea itself." *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 138 (5th Cir. 1992) (emphasis omitted).

In some cases, however, an idea can be expressed in so few ways that "protection of the expression would effectively accord protection to the idea itself." *Kregos v. Associated Press*, 937 F.2d 700, 705 (2d Cir. 1991); *accord Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 533 (5th Cir. 1994). When that happens, the idea "merges" with the expression, and the expression is deemed unprotectable. *See Kepner-Tregoe*, 12 F.3d at 533. This principle, known as the merger doctrine, requires courts to identify the idea that the work expresses, and then analyze if the idea and expression are essentially inseparable. *See Mason*, 967 F.2d at 139.

A similar restriction on copyrightable subject matter is the doctrine of "scenes a faire," which denies copyright to "expressions that are standard, stock or common to a particular subject

---

[6]      While the Fifth Circuit has not directly interpreted this provision, the Court reads the regulation as further informing the originality analysis and not its own independent bar to copyrightability. *See* 37 C.F.R. § 202.1 ("The following are *examples of works* not subject to copyright . . . .") (emphasis added); *see also Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 285 (3d Cir. 2004) (discussing the origins of the regulation).

matter or are dictated by external factors." *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1344 (5th Cir. 1994), *opinion supplemented on denial of reh'g*, 46 F.3d 408 (5th Cir. 1995).

The Court finds that the phrases at issue are not copyrightable subject matter for various reasons. First, many of the bullet points are merely short phrases or slogans lacking originality. *See, e.g.*, Doc. 52-24, Ex. X, 2 ("Just breathe easy with Breathe Right products."). Others are facts or stock phrases. *See e.g., id.* ("Available in small, medium, large, and x-large for dogs of all breeds and sizes). And a majority of the phrases, even if considered expression, invoke the merger doctrine. Ultimately, the idea being expressed is dog toys with holes that allow for easier breathing. That idea is not susceptible to a wide array of expressions, and the Court refuses to restrict other manufacturers to roundabout expressions of, for example, "playthings with openings for four-legged friends to increase breathability." *See Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 679 (1st Cir. 1967) ("[T]he subject matter would be appropriated by permitting the copyrighting of its expression. We cannot recognize copyright as a game of chess in which the public can be checkmated."). Such is the purpose of patent, which is afforded a different level of protection and has an accompanying legal regime to match. *See Baker v. Selden*, 101 U.S. 99, 102 (1879).

Like the court in *R. Ready Productions, Inc. v. Cantrell*, which found a similar list of slogans unprotectable, the Court provides a chart to clarify the analysis for each phrase at issue. *See* 85 F. Supp. 2d 672, 686 (S.D. Tex. 2000).

| PHRASE | REASON UNPROTECTABLE |
|---|---|
| No more gasping for air when carrying a tennis ball. Breathe better when playing fetch to keep your endurance up. It floats too ! | Originality (slogan); merger doctrine; fact |

| | |
|---|---|
| Get more oxygen when running and play fetch longer. | Originality (slogan); merger doctrine |
| No more constricted breathing and coughing when swimming. | Originality (slogan); merger doctrine |
| No more gasping for air when carrying a ball. | Originality (slogan); merger doctrine |
| With Breathe Right, your dog can fetch hard and breathe easy. | Originality (slogan) |
| Designed to facilitate healthy airflow, Breathe Right products feature a hollow, mesh-like design that lets air pass through the toy into your dog's mouth helping to improve stamina and reduce downtime during playtime. | Merger doctrine |
| Breathe Right high-performance breathing products are great for both land or water play. | Originality (slogan) |
| Breathe Right high-performance breathing products are designed to allow your dog to run and fetch longer during playtime. The hollow, mesh-like design facilitates breathing and airflow into your dog's lungs while running and fetching. | Merger doctrine |
| Great for playing near a pool or other body of water since it also floats. | Fact; originality (slogan) |
| Just breathe easy with Breathe Right products. | Originality (slogan) |
| Run farther and fetch longer with Breathe Right. | Originality (slogan) |
| Made from durable material, the Breathe Right products are lightweight and easy to grab. It helps to keep your dog active and healthy as it promotes exercise and activity. | Merger doctrine |
| Great for dogs that may tend to get bored easily. | Originality (slogan) |
| The Breathe Right Fetch Ball is compatible with Breathe Right Launchers. | Fact |
| Breathe Right products may also be used as a treat toy by utilizing the openings in the toy that allow you to place treats inside. | Merger doctrine |
| Available in small, medium, large, and x-large for dogs of all breeds and sizes. | Fact; scenes a faire |
| Designed to facilitate healthy air flow during play. | Originality (slogan); merger doctrine |
| Easy on your dog's mouth. | Originality (slogan) |
| Allows for easier breathing for your dog during playtime. | Originality (slogan); merger doctrine |
| Plush toys that have bite ridges and air channels that facilitates breathing and airflow into your dog's lungs while playing. | Merger doctrine |

| Run farther, play longer with the Breathe Right Duck! The cute plush duck is designed to allow your dog to breathe easy during playtime. | Merger doctrine |
|---|---|
| The Breathe Right Squirrel helps to keep your dog active and healthy as it promotes exercise and activity. Great for dogs that may tend to get bored easily. | Merger doctrine; originality (slogan) |

*See generally* Doc. 52-24, Ex. X, 2–3.

Aside from the phrases, the bottom portion of the Breathe Right Book contains Mullin's summary of the utility patent for the Breathe Right Ball. *See id.* at 3. The overall expression itself likely contains the necessary level of originality for copyright protection. *See id.* But the copyright in such an instance would be thin, extending only to the unique combination of words and phrases—the expression—Mullin used in the summary and not the underlying ideas or methods. *See Feist*, 499 U.S. at 348. Make Ideas and Mullin, however, have not provided any basis for such a claim nor established evidence for that type of infringement. As such, Petmate's Motion for Summary Judgment as to Make Ideas' copyright infringement claim is granted.

F.     *Breach of License Agreement for Selling Product Extensions*

 Petmate also seeks summary judgment as to Make Ideas' first counterclaim, which alleges Petmate has breached the license agreement by selling unlicensed products containing Make Ideas' intellectual property. Doc. 51, Br. Supp., 20–21; *see also* Doc. 52-2, Ex. A, § 1.2 (defining "Licensed Products" as pet products that "contain, reflect or reference one or more aspects of Make Ideas' Intellectual Property," as that term is defined in Section 1.1). Make Ideas' claims allege breaches occurring both during and after the term of the License Agreement. Doc. 84, Am. Answer, 15.

The pleadings and summary judgment briefs on this issue are somewhat muddled. But ultimately, Make Ideas' claims seem to allege that during the term of the License Agreement,

Petmate breached Section 6.1 of the License Agreement by manufacturing products that contained Make Ideas' intellectual property and failing to pay royalties on the sale of those products. *See id.* Make Ideas also alleges that *after* the term of the License Agreement, Petmate breached Section 9.6 of the Agreement by "manufacturing, marketing, and selling products that contain, reflect or reference . . . Make Ideas Intellectual Property . . . without permission, license, or authority from Make Ideas." *See id.*

In its Motion for Summary Judgment, Petmate points to four products Make Ideas claims were "unlicensed" and says Make Ideas waived any argument as to royalties on those products by accepting royalty payments throughout the term. Doc. 51, Br. Supp., 20–21. In response, Make Ideas argues that Petmate has conflated Make Ideas' different claims. The four products identified in its counterclaims, Make Ideas clarifies, were examples of unlicensed sales occurring after the term—not products sold during the term for which Petmate failed to pay royalties. *See* Doc. 61, Resp., 29–30.

Given this misunderstanding among the parties, the Court finds that a genuine dispute exists as to what products Petmate sold and failed to pay royalties on. *See* Doc. 51, Br. Supp., 20–21. For the same reason, Petmate has failed to provide sufficient evidence of waiver on royalty payments. *See id.* The Court does agree, however, that Make Ideas' claims for breach of the License Agreement arising from sales occurring after the License Agreement's term expired are fundamentally intellectual property claims and not claims sounding in contract. *See* Doc. 65, Reply, 13–14 n.10. As stated by Make Ideas, Petmate "manufactured, marketed, and sold products without permission or license *after* the termination of the License Agreement." Doc. 61, Resp., 29. But at that point, when the License Agreement had expired, any rights Make Ideas

had in its intellectual property would arise not from the expired contract, but rather the intellectual property itself.

Accordingly, the Court denies Petmate's summary judgment claim as to inadequate royalty payments for product sales occurring *during* the term of the License Agreement because a genuine dispute exists as to which products were sold, and Petmate has thus provided insufficient evidence of waiver. *See* Doc. 51, Br. Supp., 20–21. The Court does, however, grant summary judgment to the extent Make Ideas' claims allege a breach of contract for the manufacturing, marketing, or selling of products containing Make Ideas' intellectual property occurring *after* the term of the License Agreement. At that point, except as to a few liquidation provisions not implicated here, Make Ideas' claims would not arise from the contract, but rather the intellectual property rights themselves.

G.      *Patent Damages*

Finally, Petmate seeks summary judgment for any claim of damages because in Make Ideas' damages report, the "damage expert David Drews includes patent infringement damages against Petmate." *Id.* at 21. But Make Ideas fully acknowledges it has no counterclaim for patent infringement and is not seeking patent damages. Doc. 61, Resp., 30.  Thus, to the extent the expert report discusses patent damages, the Court will consider the issue when deciding Petmate's pending Motion to Strike the Expert Report (Doc. 71) and declines to rule on it at this time.

## IV.

## CONCLUSION

In sum, the Court **GRANTS in part** and **DENIES in part** Petmate's Motion for Partial Summary Judgment (Doc. 50) and summarizes its ruling as follows:

A. The Court **GRANTS** Petmate's Motion as to trademark ownership and thus **DISMISSES with prejudice** Make Ideas' corresponding counterclaim, Count Five.

B. The Court **GRANTS** Petmate's Motion as to joint inventorship of the disputed design patents and thus **DISMISSES with prejudice** Make Ideas' corresponding counterclaim, Count Four.

C. The Court **DENIES** Petmate's Motion as to the ownership of the design patents.

D. The Court **GRANTS** Petmate's Motion as to ownership of the disputed utility patents and **DISMISSES with prejudice** Make Ideas' Count Six only as to U.S. Patent Nos. 9,962,864 ("the '864 Patent") and 10,919,185 ("the '185 Patent").

E. The Court **GRANTS** Petmate's Motion as to copyright infringement and thus **DISMISSES with prejudice** Make Ideas' corresponding counterclaim, Count Three.

F. The Court **GRANTS in part** and **DENIES in part** Petmate's Motion as to breach of the License Agreement. The Motion is **GRANTED** to the extent Make Ideas' claims for breach of contract are for the manufacturing, marketing, or selling of products occurring after the term of the License Agreement. The Motion is otherwise **DENIED.**

G. The Court **DENIES** the Motion as to patent damages and will rule on the issue when deciding Petmate's pending Motion to Strike the Expert Report (Doc. 71).
   **SO ORDERED**.

   **SIGNED:** February 1, 2023.

   _____
   **JANE J. BOYLE**
   **UNITED STATES DISTRICT JUDGE**